UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARGARITA FLORES,

                                    Plaintiff,

        v.

MATTHEW L. BERGTRAUM,

                                    Defendant.

No. 20-CV-1240 (KMK)

<u>OPINION</u>

<u>Appearances:</u>

Kenneth J. Zweig, Esq.
Kyle C. Bruno, Esq.
Timothy Lavin, Esq.
Holly O. Ronai, Esq.
Ronai & Ronai, LLP
Port Chester, NY
*Counsel for Plaintiff*

Robert Varga, Esq.
Bonnie L. Fisher, Esq.
Law Office of Thomas K. Moore
White Plains, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

        Margarita Flores of Port Chester ("Plaintiff") brings this Action against Matthew

Bergtraum ("Defendant"), alleging that Defendant caused her serious injury when he hit her with

his car.  (*See* Compl. (Dkt. No. 1).)  Before the Court is Defendant's Motion for Summary

Judgment.  (Not. of Mot. (Dkt. No. 34).)  For the following reasons, Defendant's Motion is

granted.

## I.  Background

### A.  Factual Background

The following facts and procedural history are taken from the Parties' statements pursuant to Local Civil Rule 56.1, specifically Defendant's 56.1 Statement (Def.'s Local Rule 56.1 Statement ("Def.'s 56.1") (Dkt. No. 37)), Plaintiff's 56.1 Counterstatement (Pl.'s Local Rule 56.1 Counterstatement ("Pl.'s 56.1 Counter") (Dkt. No. 40)), and the admissible evidence submitted by the Parties.  The facts are recounted "in the light most favorable to" Plaintiff, the non-movant.  *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018) (quotation marks omitted).  The facts as described below are in dispute only to the extent indicated.[1]

### 1.  Plaintiff's Life Prior to the Accident

Prior to the accident, Plaintiff worked as a full-time employee at Lenny's Bagel ("Lenny's") in Rye Ridge, New York, beginning in January 2017.  (*See* Pl.'s 56.1 Counter ¶¶ 9, 11.)  As a full-time employee, Plaintiff "worked between 40 – 50 hours per week, 6 days a week."  (*Id.* ¶ 11.)  Plaintiff did not work on Fridays.  (*Id.* ¶ 12.)  In her role at Lenny's prior to the accident, Plaintiff was "taking and filling customer orders," namely "cooking and preparing sandwiches."  (*Id.* ¶ 10.)[2]

---

[1] In many instances, Plaintiff did not specifically respond to Defendant's factual assertions in his 56.1, and "56.1 statements not explicitly denied by [P]laintiff are deemed admitted."  *Buckman v. Calyon Sec. (USA) Inc.*, 817 F. Supp. 2d 322, 328 n.42 (S.D.N.Y. 2011).

[2] Defendant asserts that Plaintiff "worked at the register as a cashier" at Lenny's, (Def.'s 56.1 ¶ 10 (citation omitted)), which implies that she worked at the register throughout her entire employment at Lenny's.  This is inaccurate.  Defendant cites to a portion of the transcript that asks Plaintiff her "last job title" at Lenny's prior to leaving.  (*See* Pl.'s 56.1 Ctr. ¶ 10.)  The record shows that Plaintiff had other responsibilities before the accident, working solely at the register only after the accident.

### 2.  The Accident

On Friday November 9, 2018, Defendant was driving at the intersection of Broad Street and Willet Avenue in Port Chester, New York.  (*See id.* ¶ 22.)  Defendant stopped for several seconds at the intersection in anticipation of making a left turn, seeking to make sure it was safe to do so.  (*See id.* ¶¶ 22, 23.)  As Defendant took his foot off the brake, his car began to roll forward and he hit Plaintiff, a pedestrian walking in the crosswalk.  (*See id.* ¶¶ 22, 24.)  Upon impact, the car stopped.  (*See* Def.'s 56.1 ¶ 3.)[3]  At the time of the accident, it was raining.  (*See* Decl. of Robert Varga ("Varga Decl.") (Dkt. No. 35) Ex. 3 ("Pl.'s Dep. Tr.") 175:21–176:3 (Dkt. No. 35-3) (describing the rain as "kind of light"); *id.* Ex. 4 ("Def.'s Dep. Tr.") 15:14–19 (Dkt. No. 35-4) (describing the rain as "[p]retty heavy").)  Defendant has conceded liability for the accident.  (*See* Stip. (Dkt. No. 31).)

Following the accident, both the police and an ambulance were called and arrived at the scene.  (*See* Pl.'s Dep. Tr. 85:18–86:12.)  Plaintiff was then taken in the ambulance to the emergency room at Greenwich Hospital.  (*See id.* at 91:25–92:5.)

### 3.  Immediate Response Thereto

While in the emergency room, Plaintiff had x-rays taken of her right arm and knee.  (*See* Pl.'s 56.1 Counter ¶ 6.)  The x-rays revealed that she had not broken bones in the accident.  (*See id.* ¶ 7.)  Though nothing was broken, Plaintiff had sustained significant scratches and bruises to her right knee and right elbow and arm.  (*See* Pl.'s Dep. Tr. 93:3–100:4.)  Additionally, Plaintiff described a tremendous amount of pain immediately following the accident.  (*See id.* at 81:17–18

---

[3] Plaintiff testified that she "think[s]" the car "stopped."  (*See* Pl.'s Dep. Tr. 82:3.) Where the Parties do not identify substantive disputes that actually challenge the factual substance described in the relevant paragraphs, the Court will not consider them as creating disputes of fact.  *See, e.g.*, *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (citing *Risco v. McHugh*, 868 F. Supp. 2d 75, 86 n.2 (S.D.N.Y. 2012)).

("[M]y whole body was in so much pain"); *id*. at 84:3–7 ("I said I was in pain . . . I was in shock

. . . it was too much for me.").)   Plaintiff took the following day off work.  (*See* Pl.'s 56.1

Counter ¶ 13.)  Plaintiff would return to work the day after, missing a total of one day.  (*See id.* ¶

14.)

 Plaintiff testified that following the accident, she was unable to perform many of her day-

to-day household activities, including doing her laundry or carrying various objects.  (*See* Pl.'s

Dep. Tr. 200:3–10; *id.* at 215:11–216:3.)  Plaintiff pointed out that as a result of her injuries, she

was unable to pursue her General Educational Development diploma ("GED"), (*see id.* at 14:3–

17:23), or her driver's license, (*see id.* at 198:2–9).  Plaintiff's pain also required her to install

special equipment in her bathroom in order to shower without assistance.  (*See id.* at 216:4–

217:13.)  Plaintiff stated that she sometimes requires a cane to go up and down stairs.  (*See id.* at

219:6–9.)  With regard to her general leisure activities, Plaintiff has been unable to run or ride a

bicycle with her son due to her injuries.  (*See id.* at 198:9–200:2, 200:11-15.)

 Lastly, Plaintiff's role at Lenny's also changed.  Upon returning to work at Lenny's after

the accident, Plaintiff only worked behind the cash register until she left the business in

December 2019.[4]  (*See* Pl.'s 56.1 Counter ¶ 16.)

---

[4] Defendant asserts that Plaintiff's responsibilities did not change following her accident.
(*See* Def.'s 56.1 ¶ 16 (citations omitted).)  Again, this is inaccurate.  Though Plaintiff stated that
her responsibilities did not change, (*see* Pl.'s Dep. Tr. 44:15–21), once she expounded upon her
work at Lenny's, her role clearly changed, (*see id.* at 46:16–20 ("I was working in the other
position filling the orders, but I was trying, and then my co-workers, they know that I had the
accident, so they was helping me[.]")), proving this initial statement incorrect.  The date of this
change is not precisely stated.  (*See generally* Pl.'s Dep. Tr. (failing to cite a precise date for this
alteration).)  Accordingly, this material fact is not in dispute.

### 4.  Plaintiff's Spinal Injuries

Approximately one week after the injury, Plaintiff began treatment with Doctor's United for medical care—specifically physical therapy and chiropractic care—several times per week. (*See id.* at 110:21–111:22.)  On November 21, 2018, Plaintiff, per a physical therapist at Doctors United, demonstrated "decreased [active daily living] function and pain in functional performance.  [She] also show[ed] clinical decrease in range of motion and muscle strength." Decl. of Holly O. Ronai ("Ronai Decl.") Ex. 5 ("Doctors United Records") at 1 (Dkt. No. 38-5).) The next month, Plaintiff was seen by Dr. Manuel Prisciendaro, a chiropractor, who diagnosed Plaintiff's ranges of motion once again at lower-than-normal amounts.  (*See id.* at 4.)  Plaintiff continued seeing medical personnel at Doctors United for months following the accident.  (*See generally id.*)

In February 2019, Plaintiff began to see Dr. Andrew Cordiale, a board-certified orthopedic spinal surgeon.  (Ronai Decl. Ex. 1 ("Cordiale Report") ¶¶ 1, 2 (Dkt. No. 39-1).) During her first examination, Plaintiff complained of neck and back pain—quantified as a seven out of ten—as a result of the accident and stated that she had no such pain prior to the accident. (*Id.* ¶ 2.)

In June 2019, after nearly identical complaints of pain, Plaintiff received a trigger-point injection in her spine in the hopes that it would offer some ameliorative effect.  (*Id.* ¶ 6.)  During an examination at the same visit, Dr. Cordiale observed further diminished ranges of motion across Plaintiff's cervical and lumbar spine.  (*See id.*)

On November 18, 2019, Dr. Cordiale examined Plaintiff and observed yet further diminished ranges of motion in both the cervical and lumbar spine.  (*See id.* ¶ 9.)

Plaintiff returned to Dr. Cordiale yet again the next week complaining still further of pain, though Dr. Cordiale noted increased extension and rotational ranges of motion in Plaintiff's lumbar spine.  (*See id.* ¶ 11.)  Notwithstanding her increased ranges of motion, Dr. Cordiale recommended Plaintiff undergo cervical fusion surgery, citing her failure to respond to physical therapy and non-surgical treatment.  (*See id.* ¶ 12.)

Following two subsequent visits in December 2019, (*see id.* ¶¶ 13–14), Dr. Cordiale performed the cervical fusion on Plaintiff at New York Presbyterian Hospital on December 23, 2019, (*see id.* ¶ 15).

After the surgery, Dr. Cordiale continued to see Plaintiff as a patient to review her ranges of motion and gauge her pain in both her cervical and lumbar spine.  (*See id.* ¶¶ 16–21.) Notwithstanding some moderate and temporary improvements, Dr. Cordiale recommended Plaintiff undergo lumbar fusion surgery in December 2020.  (*See id.* ¶ 22.)  Dr. Cordiale reiterated his recommendation in January and March of that year.  (*See id.* ¶¶ 23, 24.)  Finally, in May 2021, Dr. Cordiale again saw Plaintiff and noted that she experienced "some improvement, but that she still experienced pain and symptoms consistent with her pre-operative conditions." (*Id.* ¶ 25.)

Dr. Cordiale summarized his opinion of Plaintiff's conditions as follows:

Based on the history I received from speaking with [Plaintiff], the medical records I reviewed, including all MRI films, objective medical testing, multiple examinations, and what I personally observed while performing her surgery, it is my professional and medical opinion with a reasonable degree of medical certainty that [Plaintiff's] injuries are traumatic in origin and causally related to the motor vehicle accident as she crossed the street as a pedestrian of November 9, 2018.

It is also my professional and medical opinion, with a reasonable degree of medical certainty, that [Plaintiff] has sustained a permanent limitation of use of her cervical and lumbar spine. The restrictions in motion of her cervical and lumbar spine have not resolved.  Further, [Plaintiff] continues to experience both neck and back pain.

It is also my professional and medical opinion, with a reasonable degree of medical certainty, that [Plaintiff] sustained a significant limitation of use of both her cervical and lumbar spine. As noted above, as it is my professional and medical opinion that the losses of use of her cervical and lumbar spine were permanent, her losses are therefore also significant.

(*Id.* ¶¶ 26–28.)

### 5.  Plaintiff's Knee Injury

In addition to her cervical and lumbar spine troubles, Plaintiff asserted that she suffered pain in her right knee following the accident.  On July 9, 2020, Plaintiff saw Dr. Stanley Liebowitz, an orthopedic surgeon associated with Park West Surgical LLC.  (*See* Ronai Decl. Ex. 6 ("Liebowitz Notes"), at 1 (Dkt. No. 39-6).)  During his initial evaluation, Dr. Liebowitz observed that motion in Plaintiff's knee "is good" but also noted that Plaintiff was experiencing pain and "clicking" in the knee.  (*Id.*)  Dr. Liebowitz noted that Plaintiff had a "PRP injection into the knee" prior to the evaluation.  (*Id.*)

At a follow-up evaluation on September 23, 2020, Dr. Leibowitz observed that Plaintiff has "full" extension but pain in flexion "beyond 90 degrees."  (*Id.* at 5.)  Dr. Leibowitz also wrote that Plaintiff complained of "trouble going up and down stairs and kneeling."  (*Id.*)

Finally, Dr. Liebowitz conducted a subsequent follow-up with Plaintiff on January 15, 2021.  (*See id*. at 6.)  Dr. Liebowitz's notes state that he performed a range of motion test, otherwise referred to as a restriction of motion test, which revealed a flexion of 125 degrees, as compared to a normal range of 140 degrees.  (*See id*.)

### 6.  Defendant's Experts' Disclosures

Defendant relies upon two experts: Dr. Jared Brandoff, M.D., and Dr. David Gushue, Ph.D.

### a.  Dr. Brandoff

Dr. Brandoff, himself a board-certified orthopedic surgeon, was hired to review Plaintiff's medical records and examine Plaintiff to determine the veracity of her claim that she sustained a serious injury to her spine or knee.  (*See generally* Decl. of Robert Varga ("Varga Decl.") (Dkt. No. 35) Ex. 5 ("Brandoff Disclosure") (Dkt. No. 35-5).)  "Having examined [Plaintiff], listened to her complains and history, and reviewed the medical records," Dr. Brandoff "concluded that [Plaintiff] sustained the following diagnoses: 1. Cervical sprain – resolved. 2. Lumbar sprain – resolved. 3. Right knee sprain – resolved."  (Brandoff Disclosure Ex. A ("Brandoff Report"), at 9.)

With respect to Plaintiff's cervical spine, Dr. Brandoff observed that "MRI imaging revealed nothing more than degenerative changes of the cervical spine.  There was diffuse disc bulging but no evidence of significant spinal cord or nerve root compression and certainly no evidence of traumatic injury."  (*Id.*)  Moreover, he stated that "there does not appear to have been an indication to perform" Plaintiff's surgery, and Plaintiff stated that "the surgery did not help and implies that it has made her worse."  (*Id.*)  Finally, Dr. Brandoff concludes:

> The only pertinent finding was subjectively and intentionally reduced ranges of motion. Despite that, she had normal strength with no long tract signs.  At this time, she requires no further treatment for her neck as a consequence of any injury allegedly sustained on November 9, 2018. She has no disability assignable to her cervical spine and is capable of working without restrictions.

(*Id.*)

With respect to Plaintiff's lumbar spine, Dr. Brandoff similarly found that there was "no evidence of traumatic injury."  (*Id.*)  Furthermore, Dr. Brandoff stated that he saw "no causally-related injury or disability to the lumbar spine related to the event of November 9, 2018.  She requires no further treatment for her low back and is capable of working."  (*Id.*)

Strikingly, Dr. Brandoff observed that Plaintiff "subjectively and intentionally reduced ranges of motion" during the exam for both her cervical and lumbar spine.  (*Id*.)  This caused Dr. Brandoff to opine that Plaintiff demonstrated "intentions to malinger."  (*Id*.)

Finally, Dr. Brandoff examined Plaintiff's right knee.  Dr. Brandoff frames his conclusion by noting first that Plaintiff's "knee only became the center of attention several months after the alleged accident."  (*Id*.)  Dr. Brandoff observed that Plaintiff's MRI showed only "degenerative changes of the cartilage and plica," which "are atraumatic findings."  (*Id*.)  Dr. Brandoff concluded that "the right knee was normal revealing no pain, no instability, and no evidence of traumatic injury.  The right knee has no disability, and from the perspective of her right knee, she requires no further treatment and is capable of working."  (*Id.*)

### b.  Dr. Gushue

Defendant also relies on Dr. David Gushue, Ph.D.  (*See* Varga Decl. Ex. 6 ("Gushue Disclosure") (Dkt. No. 35-6).)  Dr. Gushue, an engineer learned in "biomechanics, human factors and kinematics, and human injury mechanisms and tolerance," "conduct[ed] a biomechanical analysis based upon facts and information [made] available to [him] and us[ing] scientific and engineering methodologies generally accepted in the automotive industry."  (Gushue Disclosure Ex. A, at 2.)  The information includes, but is not limited to, Plaintiff's medical reports and statements given as well as the damage done to Defendant's car.  (*See generally id*.)

In light of Plaintiff's testimony regarding her location at the time of the accident as well as the car's dimensions and the damage done—or not done—to it in the crash, Dr. Gushue concluded that the car could not have been traveling fast and that the impact would have occurred at a low height relative to Plaintiff's body.  (*See id.* at 8.)  He continued:

> Based upon the fundamental laws of physics and principles of biomechanics and free-body diagrams, neither direct contact from the Toyota, nor landing on her

rights side, would have produced a compressive load path in [Plaintiff's] cervical or lumbar spine.  Therefore, the forces applied to the right side of [Plaintiff's] body during the subject incident were not of sufficient magnitude and direction to create a biomechanical injury mechanism for injuries to the intervertebral disc of the cervical or lumbar spine. . . . Moreover, the measured spinal compressive forces were insufficient to exceed physiologic limits of intervertebral discs. Therefore, to a reasonable degree of scientific and biomechanical certainty, the magnitude and direction of forces applied to [Plaintiff's] spine as a result of the subject incident were not sufficient to create a biomechanical mechanism for the reported cervical or lumbar intervertebral disc injuries.

(*Id.* at 8–9.)

B.  Procedural History

Plaintiff filed her Complaint on February 12, 2020.  (*See* Compl. (Dkt. No. 1).)  On March 4, 2020, the Summons and Complaint were served on Defendant.  (*See* Dkt. No. 5.)  On March 24, 2020, Defendant filed an Answer.  (*See* Dkt. No. 7.)  On July 30, 2020, the Court adopted a case management and scheduling order.  (*See* Dkt. No. 13.)  The following week, the Court ordered that the case be referred to a Magistrate Judge for all pretrial dealings and non-dispositive motions.  (*See* Dkt. No. 14.)

Plaintiff requested a pre-motion conference on February 11, 2021, to discuss her intent to file a motion for summary judgment with respect to liability.  (*See* Dkt. No. 23.)  Defendant opposed Plaintiff's intention to file this motion but similarly requested a pre-motion conference. (*See* Dkt. No. 24.)  The Court held the pre-motion conference on April 20, 2021, during which the Court adopted a motion scheduling order concerning Plaintiff's and Defendant's dueling motions for summary judgment as to liability and injury, respectively.  (*See* Dkt. No. 29.)  The next month, the Parties entered a stipulation in which Defendant conceded liability.  (*See* Dkt. No. 31.)

On June 3, 2021, Defendant filed the instant Motion for Summary Judgment, Rule 56.1 Statement, and accompanying papers.  (*See* Not. of Mot.; Varga Decl.; Def.'s Mem. of Law in Supp. of Mot. ("Def.'s Mem.") (Dkt. No. 36); Def.'s 56.1.)

Two weeks later, on June 17, 2021, Plaintiff filed her Opposition to the Motion, Rule 56.1 Counterstatement, and accompanying papers.  (*See* Pl.'s Mem. of Law in Opp. of Mot. ("Pl.'s Mem.") (Dkt. No. 38); Ronai Decl.; Pl.'s 56.1 Counter)

On June 24, 2021, Defendant filed his Reply Memorandum of Law in Support of its Motion for Summary Judgment.  (*See* Defendant's Reply Mem. of Law. in Supp. of Mot. for Summ. J. ("Def.'s Reply Mem.") (Dkt. No. 41).)  The same day, Defendant filed a Reply Affirmation in support of his Motion, attaching a supplemental report of one of Defendant's expert witnesses.  Four days later, Plaintiff moved to preclude the supplemental report.  (*See* Dkt. No. 43.)  Following letter briefing on this issue, (*see* Dkt. Nos. 44 & 45), the Court granted Plaintiff's motion to preclude the supplemental report, (*see* Dkt. No. 46.).

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (same); *Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294,

314 (S.D.N.Y. 2014) (same).  "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same).

 "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; [s]he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted).  At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual

issues to be tried." *Brod*, 653 F.3d at 164 (citation omitted).  Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex*, 477 U.S. at 323–24).  However, a district court should consider only evidence that would be admissible at trial.  *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998).  "[W]here a party relies on affidavits or deposition testimony to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).[5]

## B. Analysis

### 1. New York Insurance Law

Pursuant to New York's Insurance Law, "known otherwise as the No-Fault Statute," *Manrique v. State Farm Mut. Auto. Ins. Co.*, No. 21-CV-224, 2021 WL 5745717, at *2 (S.D.N.Y. Dec. 2, 2021) (citing *Pryce v. Progressive Corp.*, No. 19-CV-1467, 2019 WL 8163424, at *1 (E.D.N.Y. Nov. 15, 2019)), or the "No-Fault Law," *Licari v. Elliott*, 441 N.E.2d 1088, 1090 (N.Y. 1982), "a party may only sue to recover damages for injuries caused by a car

---

[5] This case is brought under 28 U.S.C. § 1332(a)(2).  (*See* Compl. ¶ 2; Pl.'s Mem. 12.) Accordingly, "New York substantive law governs." *Svensson v. Securian Life Ins. Co.*, 706 F. Supp. 2d 521, 525 n.4 (S.D.N.Y. 2010) (citing *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996)).  "However, federal law applies to procedural aspects of the claim," *Decker v. Middletown Walmart Supercenter Store*, No. 15-CV-2886, 2017 WL 568761, at *3 (S.D.N.Y. Feb. 10, 2017) (citing *Hanna v. Plumer*, 380 U.S. 460, 465 (1965)), and "the moving party's burden of proof on a summary judgment motion is procedural," so whether movant met its requisite burden is "governed by federal law," *id.* (citing *Tingling v. Great Atl. & Pac. Tea Co.*, No. 02-CV-4196, 2003 WL 22973452, at *2 (S.D.N.Y. Dec. 17, 2003)); *see also Leandro v. Wal-Mart Supercenter Store No. 2104*, No. 19-CV-2108, 2021 WL 2742622, at *4 (S.D.N.Y. June 30, 2021); *Gisser v. Wal-Mart Stores E., LP*, No. 17-CV-5293, 2018 WL 6493101, at *3 (S.D.N.Y. Dec. 7, 2018); *Hughes v. United States*, No. 12-CV-5109, 2014 WL 929837, at *4 (S.D.N.Y. Mar. 7, 2014).

accident in cases of 'serious injury,'" *Hernandez v. Leichliter*, No. 14-CV-5500, 2016 WL

676455, at *1 (S.D.N.Y. Feb. 17, 2016) (quoting N.Y. Ins. Law § 5104(a)); *see also Smith v.*

*Gray*, No. 19-CV-2169, 2021 WL 3603588, at *4 (E.D.N.Y. Aug. 13, 2021) (same) (quoting

*Kang v. Romeo*, No. 18-CV-4033, 2020 WL 4738947, at *8 (E.D.N.Y. Aug. 14, 2020)).  The

purpose of this limitation is "to weed out frivolous claims and limit recovery to significant

injuries." *Bewry v. Colonial Freight Sys.*, No. 01-CV-5634, 2002 WL 31834434, *2 (S.D.N.Y.

Dec. 17, 2002) (quoting *Dufel v. Green*, 647 N.E.2d 105, 107 (N.Y. 1995)); *see also Catania v.*

*United States*, No. 14-CV-553, 2017 WL 6317158, at *14 (W.D.N.Y. Dec. 11, 2017) ("By

enacting the No-Fault Law, the Legislature modified the common-law rights of persons injured

in automobile accidents to the extent that plaintiffs in automobile accident cases no longer have

an unfettered right to sue for injuries sustained." (quoting *Licari*, 441 N.E.2d at 1091)), *report*

*and recommendation adopted*, 2018 WL 1471400 (W.D.N.Y. Mar. 26, 2018).

> New York's no-fault statute specifically identifies nine types of "serious injuries"
> [for which one can sue]: (1) "significant disfigurement"; (2) a "permanent loss of
> use of a body organ, member, function, or system"; (3) a "permanent consequential
> limitation of use of a body organ or member"; (4) a "significant limitation of use of
> a body function or system"; (5) "a medically determined injury or impairment of a
> non-permanent nature, which prevents the injured person from performing
> substantially all of the material acts which constitute such person's usual and
> customary daily activities for not less than ninety days during the one hundred
> eighty days immediately following the occurrence of the injury or impairment" (the
> "90/180" category); (6) "death"; (7) "dismemberment"; (8) "fracture"; and (9) the
> "loss of a fetus."

*Ruffin v. Rana*, No. 11-CV-5406, 2013 WL 4834368, at *7 (S.D.N.Y. Sept. 4, 2013) (quoting

N.Y. Ins. Law § 5102(d)).

"[A] court should decide the threshold question of whether the evidence would warrant a

jury finding that the injury qualifies as a 'serious injury.'" *Yong Qin Luo v. Mikel*, 625 F.3d 772,

777 (2d Cir. 2010) (per curiam) (citing *Licari*, 441 N.E.2d at 1091).  At the summary judgment

stage, this question is itself a "burden-shifting scheme" described as follows:

> [O]n summary judgment, a defendant must establish a prima facie case that [the] plaintiff did not sustain a "serious injury" within the meaning of Insurance Law § 5102(d).  In support of its argument that there is no such serious injury, [the] defendant may rely on the unsworn reports by [the] plaintiff's physicians, but must provide evidence from its own physicians in the form of sworn affidavits.  Once a defendant's burden is met, the plaintiff is then required to establish a prima facie case that [s]he sustained a serious injury.  For [the] plaintiff to defeat a summary judgment motion, admissible evidence must be presented in the form of sworn affidavits by physicians.

*Id.* at 777 (quoting *Barth v. Harris*, No. 00-CV-1658, 2001 WL 736802, at *2 (S.D.N.Y. June

25, 2001)); *see also Hernandez*, 2016 WL 676455, at *1 (describing this burden shifting scheme

under New York law); *Lizarra v. Figueroa*, No. 12-CV-3119, 2014 WL 1224539, at *3

(S.D.N.Y. Mar. 21, 2014) (same).

    In *Toure v. Avis Rent A Car Systems, Inc.*, the New York Court of Appeals made clear

that New York law "require[s] objective proof of a plaintiff's injury in order to satisfy the

statutory serious injury threshold; subjective complaints alone are not sufficient."  774 N.E.2d

1197, 1199–200 (N.Y. 2002) (citations omitted).  The objective proof may be satisfied by "an

expert's designation of a numeric percentage of a plaintiff's loss of range of motion . . . ."  *Id.*

Alternatively, "[a]n expert's qualitative assessment of a plaintiff's condition may also suffice,

provided that the evaluation has an objective basis and compares the plaintiff's limitations to the

normal function, purpose[,] and use of the affected body organ, member, function[,] or system."

*Id.* (emphasis omitted); *see also Rivera v. United States*, No. 10-CV-5767, 2012 WL 3132667, at

*10 (S.D.N.Y. July 31, 2012) (same) (collecting cases); *Madden v. Lee*, No. 01-CV-7856, 2002

WL 31398951, at *4 (S.D.N.Y. Oct. 25, 2002) ("To demonstrate a serious injury, [a] plaintiff

cannot rely only on subjective complaints of pain.  Rather, the plaintiff must submit medical

reports detailing the injury based on objective medical determinations." (citations omitted)).

However, a defendant can rely on unsworn medical records that a plaintiff provides at the

summary judgment stage, though doing so opens the door to allow the plaintiff to do the same in

opposing summary judgment. *See Kearse v. N.Y.C. Transit Auth.*, 789 N.Y.S.2d 281, 283 n.1

(App. Div. 2005) (collecting cases).

Relevant here are the third, fourth, and fifth types of serious injuries, as those are the

categories into which Plaintiff avers her injuries fall. (*See* Def.'s Mem. 7–11; Pl.'s Mem. 18.)[6]

Importantly, the Court of Appeals has combined the third and fourth type of injury category for

purposes of interpretation. *See, e.g.*, *Toure*, 774 N.E.2d at 1201; *Gaddy v. Eyler*, 591 N.E.2d

1176, 1177 (N.Y. 1992) (evaluating a plaintiff's evidence under both the "permanent

consequential limitation" and "significant limitation" prongs simultaneously).  For this reason,

the Court refers to these types of injuries as the "permanent" injuries, as compared to the "short-

term" injury of the 90/180 category.

With respect to permanent injuries, the Court of Appeals has "held that '[w]hether a

limitation of use or function is "significant" or "consequential" (i.e., important) relates to

medical significance and involves a comparative determination of the degree or qualitative

nature of an injury based on the normal function, purpose and use of the body part.'"  *Toure*, 774

N.E.2d at 1201 (alteration omitted) (quoting *Dufel*, 647 N.E.2d at 107).  "While there is no set

percentage for determining whether a limitation in range of motion is sufficient to establish

---

[6] Defendant's Memorandum in Support nominally combines the second type of serious injury, one's permanent loss of use, and the third type of serious injury, one's permanent consequential limitation.  (*See* Def.'s Mem 7–8.)  Plaintiff's Memorandum in Opposition, on the other hand, does not specifically cite a permanent loss of use.  (*See* Pl.'s Mem. 18.)  Because Plaintiff does not claim a permanent loss of use, this category is not considered here.

'serious injury,' the cases have generally found that a limitation of [20%] or more is significant for summary judgment purposes." *Hodder v. United States*, 328 F. Supp. 2d 335, 356 (E.D.N.Y. 2004) (collecting cases); *see also Young Sung Lee v. Garvey*, 718 F. App'x 11, 15 (2d Cir. 2017) (summary order) (citing *Hodder* approvingly when concluding that a 10% limitation in range of motion does not rise to the level of a "serious injury" under § 5102(d)).[7]

The short-term injury category asks whether the accident caused an injury that "prevent[ed] the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities" for 90 of 180 days following the accident. N.Y. Ins. Law § 5102(d). "The term 'substantially all' 'should be construed to mean that the person has been curtailed from performing his usual activities to a great extent rather than some slight curtailment.'" *Sanchez v. Travelers Cos.*, 658 F. Supp. 2d 499, 508 (W.D.N.Y. 2009) (emphasis omitted) (quoting *Licari*, 441 N.E.2d at 1091).

Notably, "New York courts have frequently held that there is no 'serious injury' under the 90/180 category as a matter of law, and thus that summary judgment for a defendant is appropriate, if a plaintiff returns to work within 90 days of a car accident." *Hernandez*, 2016 WL 676455, at *2 (collecting cases). But that is not "necessarily" the case. *Sanchez*, 658 F. Supp.2d at 509 ("While an injured party's diminished ability to perform the actual tasks comprising his or her regular employment may, in some circumstances, indicate that there has been no substantial curtailment of activity, the mere fact that [the] plaintiff was able to return to

---

[7] "[C]ourts in the Second Circuit have often noted that unpublished opinions and Summary Orders from the Second Circuit Court of Appeals, while not binding, can be instructive to district courts in resolving particular disputes, and also may be seen as highly persuasive and predictive of how the Second Circuit Court of Appeals would decide an issue in the future." *Liana Carrier Ltd. v. Pure Biofuels Corp.*, No. 14-CV-3406, 2015 WL 10793422, at *4 (S.D.N.Y. Aug. 14, 2015) (citing *Shady Records, Inc. v. Source Enters., Inc.*, 371 F. Supp. 2d 394, 398, 398 n.1 (S.D.N.Y. 2005)), *aff'd*, 672 F. App'x 85 (2d Cir. 2016).

work in some capacity is not necessarily fatal to her claim of serious injury." (quoting *Vasquez v. Weiss*, 650 N.Y.S.2d 60, 61 (App. Div. 1996))); *Thomas by Thomas v. Drake*, 535 N.Y.S.2d 229, 231 (App. Div. 1988) ("The mere fact that plaintiff returned to school does not foreclose the issue as to whether his activities remained substantially impaired."). Indeed, New York courts have denied a defendant's summary judgment motion with respect to the short-term injury category where a plaintiff returned to work where such a return was "because of economic necessity." *Sole v. Kurnik*, 500 N.Y.S.2d 872, 873 (App. Div. 1986), *appeal dismissed*, 498 N.E.2d 436 (N.Y. 1986); *see also Baez v. Goldman*, 690 N.Y.S.2d 815, 816 (App. Div. 1999); *Vazquez*, 650 N.Y.S.2d at 61. The question must instead be determined based on the totality and nature of the admissible evidence put forward. *See, e.g.*, *Labeef v. Baitsell*, 960 N.Y.S.2d 809, 810 (App. Div. 2013) (discarding inadmissible evidence and relying solely on admissible medical evidence put forward by the plaintiff to adjudge whether the plaintiff adequately rebutted the defendant's arguments).

### 2.  Plaintiff's Cervical Spine Injury

In support of his Motion, Defendant relies on Dr. Brandoff's expert report, which explains why Plaintiff did not sustain a "serious injury" in her cervical spine in either the short-term or the permanent categories. Dr. Brandoff points first to the MRI images, which were taken within 180 days of the accident.[8] According to Dr. Brandoff, "MRI imaging revealed nothing more than degenerative changes of the cervical spine. There was diffuse disc bulging but no evidence of significant spinal cord or nerve root compression and *certainly no evidence of traumatic injury*." (Brandoff Report 9 (emphasis added).) Moreover, Dr. Brandoff states that

---

[8] The accident occurred on November 8, 2018, and the MRI occurred on February 25, 2019, which spans 109 days.

"there does not appear to have been an indication to perform anterior cervical discectomy and fusion surgery," but "to the extent Dr. Cordiale did feel that surgery was prudent, then that surgery was performed to treat an underlying degenerative condition and in no way was it performed to treat any causally-related injury allegedly sustained by the accident on November 9, 2018." (*Id.* at 10.) This portion of the report alone is sufficient to establish Defendant's prima facie case in the short term. *See Spencer v. Chung*, No. 20-CV-599, 2021 WL 5360430, at *1 (S.D.N.Y. Nov. 17, 2021) ("In support of his motion for summary judgment, the defendant provides the sworn affidavits of a radiologist and an orthopedic surgeon, who assert that the defendant's impairments were either transient, the result of a preexisting degenerative condition, or the result of a prior injury. These affidavits present a prima facie case that the plaintiff did not incur a serious injury."); *Smith*, 2021 WL 3603588, at *5 (ruling that the defendant established a prima facie case where the defendant's expert physician concluded that "injuries to the cervical and lumbar spine depicted in the MRIs were degenerative changes which could not have resulted from the incident of record as described" (quotation marks omitted)).

Plaintiff argues that Dr. Brandoff's report should be ignored regarding Plaintiff's short-term serious injury because his examination took place long enough after the accident that it could not credibly assess Plaintiff's claim of a non-permanent injury. This is incorrect. It is true that when a defense expert's report fails to discuss the initial post-accident period of time, it may not be used to satisfy the defendant's burden. *See, e.g.*, *Bass v. Hout*, No. 13-CV-8516, 2019 WL 6527944, at *5 (S.D.N.Y. Dec. 4, 2019) ("The defendants' expert . . . failed to address the 180-day period after the 2012 accident at all in his expert report, and therefore the defendants have failed to make their prima facie case on this point."); *Robinson v. Joseph*, 952 N.Y.S.2d 187, 189 (App. Div. 2012) ("[The] [d]efendants failed to meet their initial burden as to [the]

plaintiff's 90/180-day claim, since they relied only on the reports of their medical experts who did not examine [the] plaintiff during the relevant statutory period and did not address [the] plaintiff's condition during the relevant period.").

But Dr. Brandoff's report explicitly addresses Plaintiff's initial medical condition, as determined by her first MRI scans, which were taken within the 180-day window.  Additionally, Dr. Brandoff reviewed notes from Plaintiff's initial examinations by all medical professionals involved to come to this conclusion, which also occurred within the 180-day period.  Therefore, Plaintiff's attempt to undermine Defendant's successful establishment of his prima facie case falls short.  *Compare* (Brandoff Report 6 (disclosing that he reviewed images and notes taken within the 180-day mark for his evaluation)), *with Bass* 2019 WL 6527944, at *5, *and Baytsayeva v. Shapiro*, 868 F. Supp. 2d 6, 24 (E.D.N.Y. 2012) ("[The defendant's medical expert's] report only speaks to the condition of [the] plaintiff in May 2010, two and one-half years after the subject accident, not [the] plaintiff's condition during the six months immediately after the accident." (quotation marks omitted)), *and Robinson*, 952 N.Y.S.2d at 189, *and Quinones v. Ksieniewicz*, 915 N.Y.S.2d 70, 71 (App. Div. 2011) (holding that "[the] defendants failed to establish prima facie that [the] plaintiff did not sustain [90/180 injury]" because "[t]he reports of [the] defendants' medical experts were based on examinations of [the] plaintiff conducted nearly two years after the subject accident" and lacked evidence that the expert considered anything from within that time frame).

Dr. Brandoff's report similarly establishes a prima facie case that Plaintiff did not suffer a permanent cervical injury.  Dr. Brandoff's conclusion with respect to Plaintiff's imaging is applicable to this inquiry and supports a finding that no permanent injury was sustained, as he observed that subsequent imaging beyond the 180-day mark was "benign-appearing."  (Brandoff

Report 10.)  Dr. Brandoff conceded that Plaintiff displayed a restricted range of motion in her

cervical spine—a fact on which Plaintiff harps repeatedly—but believed that to be the result of

Plaintiff "subjectively and intentionally reduc[ing] [her] ranges of motion," (*id.*)—a fact which

Plaintiff disputes and herself maligns, (*see* Pl.'s Mem. 2, 15).  Indeed, Dr. Brandoff's conclusion

captures his overall position: Plaintiff "had normal strength with no long tract signs[,] requires

no further treatment for her neck as a consequence of any injury allegedly sustained on

November 9, 2018[,] has no disability assignable to her cervical spine[,] and is capable of

working without restrictions."  (Brandoff Report 10.)  Again, this is sufficient to establish

Defendant's prima facie case.  *See Spencer*, 2021 WL 5360430, at *1 ("In support of his motion

for summary judgment, the defendant provides the sworn affidavits of a radiologist and an

orthopedic surgeon, who assert that the defendant's impairments were either transient, the result

of a preexisting degenerative condition, or the result of a prior injury. These affidavits present a

prima facie case that the plaintiff did not incur a serious injury."); *Watson-Tobah v. Royal*

*Moving & Storage, Inc.*, No. 13-CV-7483, 2014 WL 6865713, at *17 (S.D.N.Y. Dec. 5, 2014)

("[The] [d]efendants have established a prima facie case of a lack of 'serious injury' through the

sworn report of [the defendants' medical expert], who conducted an independent medical

examination of [the] plaintiff and concluded that the examination was positive only for

subjective complaints and that there was no objective evidence of any [injury]." (quotation marks

omitted)); *Gay v. Cevallos*, No. 10-CV-949, 2011 WL 2015528, at *6 (S.D.N.Y. May 17, 2011)

(holding that the defendant established his prima facie case where physicians concluded that

"MRI films . . . showed nothing more than pre-existing pathology related to the degenerative

disease process and could not be attributed to a single accident" and that "based on a physical

examination of [the] [p]laintiff and a review of [the] [p]laintiff's MRI films and other medical

records, [the defendant's expert physician] concluded that any limitations on [the] [p]laintiff's physical condition were either self-imposed or the result of longstanding degenerative conditions and were not the result of the [] [a]ccident."); *Kerr v. Klinger*, 896 N.Y.S.2d 868, 868–69 (App. Div. 2010) ("[The] [d]efendant established her prima facie entitlement to summary judgment by submitting evidence, including the affirmed reports of a radiologist, who, upon reviewing the MRI films taken after [the] plaintiff's accident, concluded that the disc bulges and/or herniations revealed therein were the result of degenerative disc disease and not caused by the automobile accident at issue.").

Because Defendant has met his initial burden, Plaintiff must establish a prima facie case that she sustained a serious injury in her cervical spine as a result of the accident to survive the instant Motion. Aside from her aforementioned argument as to why Dr. Brandoff's report should be discarded, Plaintiff rebuts Defendant's case first by asserting that the Parties' "battle of the experts" precludes summary judgment "because the 'credibility of the conflicting doctors' opinions are for the jury to resolve.'" (Pl.'s Mem. 17 (quoting *Ocean v. Hossain*, 7 N.Y.S.3d 73, 75 (App. Div. 2015)); *see also id.* at 16–18.) Thereafter, Plaintiff asserts that she has suffered serious injury by reviewing the standards for each of the categories of injury, points to Plaintiff's restriction on daily activities as well as her return to work with lighter or restricted responsibilities, ties those to apposite medical records, and compares her situation to analogous state court cases in which plaintiffs were found to have suffered a serious injury. (*Id.* at 18–25.)[9]

---

[9] Plaintiff does not trifurcate her three injuries as the Court does here; instead, Plaintiff groups the injuries together and argues them in broad strokes, relying primarily on evidence regarding her cervical spine. (*See* Pl.'s Mem. 18–25.) For this reason, the Court addresses Plaintiff's cervical spine first and foremost, doing so in both the permanent and short-term time horizons, and then turns to her subsequent injuries and evaluates them in the same fashion.

Plaintiff's arguments are unavailing for multiple reasons, and she cannot establish her own claim in either the short- or long-term.

In the short-term, while, as stated above, there exist a handful of cases in which plaintiffs were found to have suffered short-term serious injuries notwithstanding quick returns to work, the majority of the cases hold that doing so, even on a limited, light, or restricted basis, weighs heavily against establishing a short-term serious injury. *See Hernandez*, 2016 WL 676455, at *2 ("New York courts have frequently held that there is no 'serious injury' under the 90/180 category as a matter of law, and thus that summary judgment for a defendant is appropriate, if a plaintiff returns to work within 90 days of a car accident."); *Martin v. Portexit Corp.*, 948 N.Y.S.2d 21, 24 (App. Div. 2012) (holding that the plaintiff could not sustain a short-term serious injury claim upon claiming, "unsupported by any documentation from his employer," that he "returned to work on a . . . light duty schedule approximately three weeks after the accident"); *Murphy v. Arrington*, 744 N.Y.S.2d 255, 256–57 (App. Div. 2002) (finding insufficient proof to demonstrate that the plaintiff police officer, who was dragged by a car, sustained a serious short-term injury where he missed only six weeks of work after the accident and was put on light duty assignment for another six weeks).  Therefore, Plaintiff's return to Lenny's after missing only one day, (Pl.'s 56.1 Counter ¶ 13), cuts against her claim that she sustained a serious short-term injury in her cervical spine.

Precedent analogous to Plaintiff's claims regarding her household activities similarly undermine her claim.  In *Gil v. Western Express, Inc.*, a plaintiff similarly "allege[d] that she had difficulty completing household chores, driving long distances, lifting certain heavy items, and walking on stairs."  No. 15-CV-9611, 2017 WL 4129634, at *12 (S.D.N.Y. Sept. 14, 2017).  There, the court held, "these activities do not constitute substantially all of the [p]laintiff's

normal activities for 90 of the first 180 days after the accident.  Indeed, rather than limiting her normal activities to a great extent it appears to the [c]ourt that the [p]laintiff's injuries only caused her to suffer a slight curtailment to her usual activities." *Id.* (quotation marks and alterations omitted).  This case presents nearly identical facts, including the list of activities that allegedly aggravated Plaintiff's pain.  (*See* Pl.'s Mem. 10 (citing Plaintiff's alleged difficulty performing "household chores, such as laundry, cooking, and cleaning").)  While the Court recognizes that the activities Plaintiff allegedly could not do are not insubstantial, Plaintiff's claims do not rise to the level of "substantially all . . . normal activities."  *Gil*, 2017 WL 4129634, at *12; *see also Tenzen v. Hirschfeld*, No. 10-CV-50, 2011 WL 6034462, at *8 (E.D.N.Y. Dec. 5, 2011) (concluding that the plaintiff's "difficulty dressing herself" does not rise to the level of a serious short-term injury); *Licari*, 441 N.E.2d at 1092–93 (affirming grant of summary judgment where the court found that the plaintiff did not sustain a serious short-term injury despite testifying that she "could not eat, dress[,] or bathe without assistance" following the accident); *Flores v. Singh*, 786 N.Y.S.2d 491, 492 (App. Div. 2004) (finding that the plaintiff's difficulty getting dressed, inability to "swim or dive off of a diving board" "on several vacations following the accident," and one-day absence from work did not constitute a substantial curtailment of daily activities and thus did not rise to a short-term serious injury).

Plaintiff's restriction of motion ("ROM") evaluations cannot support her claim in either the short- or long-term.  Where "a decreased ROM is asserted as proof of a serious injury, the medical findings must indicate the methodology used to calculate the reduced ROM, as well as whether such methodology consisted of active or passive ROM tests."  *Catania*, 2017 WL 6317158, at *16 (citing *Watson-Tobah*, 2014 WL 6865713, at *18).  Briefly,

> In performing active [ROM] tests, the patient is asked to move the body part at issue in various directions and is asked to indicate when further movement becomes

24

restricted or painful.  In the passive [ROM] test, the examiner moves the injured body part until the motion is restricted or pain is created.  The doctor measures the range of the patient's ability to move the subject body part, sometimes with a protractor, and then compares that to the patient's "normal" range of motion if the patient has a prior history with the doctor, or with what is considered normal of people of the same age and sex of the patient.

*Hodder*, 328 F. Supp. 2d at 355.

Plaintiff's examinations did no such thing.  Plaintiff's physical therapist, Sakshi Jamwal, and chiropractor, Manuel Prisciandaro, each administered a ROM test on Plaintiff, though the tool by which they measured her restrictions was not made clear.  (*See* Doctors United Records 1, 4.)[10]  Therefore, Plaintiff's ROM tests from Doctors United cannot be relied upon to establish her claim.  *See Mitchell v. Kowalski*, 708 N.Y.S.2d 437, 438 (App. Div. 2000) (affirming trial court's grant of judgment as a matter of law in favor of the defendant where the plaintiff's chiropractor "testified to the degree of limitation in range of motion of the plaintiff's neck, [but] he did not testify to the objective tests used to arrive at his conclusions").

Dr. Cordiale's examinations are more substantial insofar as he explicitly stated that he observed a ROM using a goniometer, (*see* Cordiale Report ¶¶ 4, 6, 9, 11, 13, 14, 18, 19, 20, 21, 23, 24, 25), a "tool[] used to measure the patient's range of motion . . . comprised of two rule[r]s

---

[10] Plaintiff's physical therapy and chiropractic records are not sworn.  Ordinarily, Plaintiff would not be permitted to rely upon them.  *See Yong Qin*, 625 F.3d at 777 (citing *Barth*, 2001 WL 736802, at *2).  However, "even a reference to the unsworn or unaffirmed reports in [a defendant's] moving papers," including via the defendant's expert reviewing and relying upon them, "is sufficient to permit the plaintiff to rely upon and submit these reports in opposition to the motion." *Kearse*, 789 N.Y.S.2d at 283 n.1; *see also Waldman v. Atl.-Heydt Corp.*, No. 04-CV-2154, 2006 WL 2010783, at *6 (E.D.N.Y. July 14, 2006) (citing *Kearse* to allow the plaintiff to cite to unsworn medical records because the defendants "did in fact refer to [the] [p]laintiffs' unsworn medical reports in [their] motion for summary judgment").  Plaintiff's attendance at physical therapy and chiropractic treatments is specifically referenced multiple times in Defendant's Memorandum of Law.  (*See* Def.'s Mem. 4, 10.)  Dr. Brandoff similarly references having reviewed those records to support his conclusion.  (Brandoff Report 1, 2, 3–4, 9.)  Therefore, Plaintiff may rely on those records at this juncture.

connected at one end by a hinge off of which a scale hangs," *Rivera*, 2012 WL 3132667, at *2 n.8. But he too failed to note the type of ROM test he undertook. (*See generally id.* (including no discussion of whether his ROM tests were active versus passive).) Failing to detail the sort of test undertaken is no small, hyper-technical matter. Because the passive test is "based on more objective criteria," *Mastrantuono v. United States*, 163 F. Supp. 2d 244, 255 (S.D.N.Y. 2001) (collecting cases), the results of a passive test will weigh far more heavily in a plaintiff's favor regarding whether she has raised a triable issue of fact than the results of an active test. Thus, Dr. Cordiale's "findings are not particularly useful to this Court because he never clarified whether the tests he conducted to elicit these results were passive or active range of motion tests." *Hodder*, 328 F. Supp. 2d at 357; *see also Ruffin*, 2013 WL 4834368, at *12 (dismissing ROM evaluations as medical evidence that failed to denote if the test was active or passive because, given this omission, "it remains unclear to what extent her results reflect objective medical findings rather than [the] plaintiff's subjective complaints" ); *Gillick v. Knightes*, 719 N.Y.S.2d 335, 336 (App. Div. 2001) ("We have repeatedly held that a diagnosis of loss of range of motion, because it is dependent on the patient's subjective expressions of pain, is insufficient to support an objective finding of a serious injury."); *cf. Perez v. United States*, No. 17-CV-4838, 2019 WL 2336526, at *5 (S.D.N.Y. June 2, 2019) (finding an expert who performed "both active and passive [ROM] tests" to be more credible than opposing expert, who performed only an active ROM test).

Dr. Cordiale's Narrative Report appended to his Affirmation also sinks Plaintiff's claim as to both a short- and long-term injury in her cervical spine. The Narrative Report includes Dr. Cordiale's notes from his evaluations of Plaintiff as her treating physician. (*See* Cordiale

Report 10–43.)[11]   In this Narrative Report, Dr. Cordiale stated that during Plaintiff's initial visit, Plaintiff's pain in her cervical spine rated a seven out of ten, that she received physical therapy regularly, that she wore a brace to stabilize her back, and that her pain worsened with "lifting, carrying, bending, and moving."  (*Id.* at 10–11.)  Dr. Cordiale also stated that Plaintiff expressed that she suffered no history of prior neck pain, which suggested the accident to be the sole cause of the injury.  (*Id.* at 11.)  These points militate towards establishing a serious injury.

Further details from Dr. Cordiale's notes, however, undermine whatever persuasive value these statements would otherwise have.  Specifically, Dr. Cordiale disclosed in his notes on his initial evaluation that "[t]he problem *does not interfere with the patient's daily normal function*." (*Id.* at 10 (emphasis added).)  Dr. Cordiale would go on to include that identical statement in notes for each of Plaintiff's follow-up examinations prior to her surgery: on June 17, 2019, (*id.* at 12), November 18, 2019, (*id.* at 13), November 25, 2019, (*id.* at 14), December 9, 2019, (*id.* at 16), and December 16, 2019, (*id.* at 18).  This admission clearly undercuts Plaintiff's claim of both a short-term and long-term injury.

Finally, even if the Court were to take records from Dr. Cordiale and Doctors United into consideration, neither adequately articulates causation in the face of Dr. Brandoff's causal analysis.  "The law is clear that a conclusory expert opinion as to causation is insufficient to defeat a motion for summary judgment." *Watson-Tobah*, 2014 WL 6865713, at *13 (citations omitted).

Therefore, "[w]hen a defendant submits persuasive evidence that a plaintiff's alleged pain and injuries are related to a pre-existing condition, the plaintiff has the

---

[11] Above, the Court cites to Dr. Cordiale's Affirmation, which appears on Pages 1–9 of the Exhibit to Ronai's declaration, using specific paragraph pincites.  This is because the Affirmation includes paragraph numbers.  Because the Narrative Report does not include such paragraph numbers, the Court refers to the Narrative Report using page numbers to the overall exhibit.

> burden to come forward with evidence addressing the defendant's claimed lack of causation; if the plaintiff fails to meet that burden, the defendant is entitled to summary dismissal of the complaint."

*Rhone v. United States*, No. 04-CV-5037, 2007 WL 3340836, at *6 (S.D.N.Y. Nov. 9, 2007)

(quoting *Arenes v. Mercedes Benz Credit Corp.*, No. 03-CV-5810, 2006 WL 1517756, at *8

(E.D.N.Y. June 1, 2006)).  To that end, New York courts have found in favor of the defense

when, for instance, a plaintiff's treating physician "fail[ed] to give any objective basis for

concluding that [the] plaintiff's alleged limitations resulted from the [] accident, rather than from

prior . . . injury, or from the preexisting degenerative conditions . . . that were identified by [the]

defendants' [medical experts]."  *Montgomery v. Pena*, 798 N.Y.S.2d 17, 18 (App. Div. 2005).

In this case, Dr. Brandoff posited that any traumatic injury sustained in the accident

amounted to a sprain that has since healed and that any residual pain or symptoms are a result of

degenerative conditions rather than long-standing effects from the accident.  (*See* Brandoff

Report 9–10.)  Dr. Cordiale, in response, simply claims to have considered Plaintiff's medical

history to arrive at the conclusion that Plaintiff's injuries "are traumatic in origin and causally

related to the motor vehicle accident."  (Cordiale Report ¶ 26.)  Dr. Cordiale's conclusory

preamble and framing fall far short of meeting Plaintiff's required burden, having "failed to

refute, or even to address, the opinion of [D]efendant's expert that the [injury] resulted from a

preexisting degenerative condition."  *Agard v. Bryant*, 805 N.Y.S.2d 348, 349 (App. Div. 2005);

*see also Pommells v. Perez*, 830 N.E.2d 278, 283 (N.Y. 2005) ("[The] [p]laintiff's submission

left wholly unanswered the question [of] whether the claimed symptoms diagnosed by [the]

defendant's expert] were caused by the accident."); *Spanos v. Fanto*, 879 N.Y.S.2d 878, 879

(App. Div. 2009) (holding that the "plaintiffs failed to raise a triable issue of fact whether [the]

plaintiff's alleged pain and injuries were causally related to the subject accident rather than those

preexisting conditions [identified by the defendant's expert]"); *Nickolson v. Albishara*, 877 N.Y.S.2d 67, 67 (App. Div. 2009) (reversing denial of summary judgment to the defendant because the "[p]laintiff's expert radiologist failed to address, let alone rebut, [the] defendant's radiologist's nonconclusory finding that [the] plaintiff's disc bulges and herniations were caused by a preexisting degenerative condition, or even relate the disc bulges or herniations to the accident"); *Carter v. Full Serv., Inc.*, 815 N.Y.S.2d 41, 43 (App. Div. 2006) ("In order to recover damages for non-economic loss related to a personal injury allegedly sustained in a motor vehicle accident, a plaintiff is required to present competent, non-conclusory expert evidence sufficient to support a finding . . . that the injury was proximately caused by the accident at issue."). Similarly, the records from Plaintiff's medical caretakers at Doctors United blithely recite Plaintiff's purported causation without any scrutiny or questioning. (*See generally* Doctors United Records (repeating Plaintiff's untested assertion that the pain was the result of the accident).) Ultimately, Dr. Cordiale's and Doctors United's conclusory claims of causation and failure to address Dr. Brandoff's conclusion prevent the Court from relying upon his Affirmation in Plaintiff's efforts to establish a prima facie case of a cervical spine injury.

Taken altogether, Plaintiff cannot establish a prima facie case of having sustained a serious cervical spine injury as a result of the accident in either the short-term or permanent categories, so the Court grants Defendant's Motion with respect to Plaintiff's cervical spine.

### 3.  Plaintiff's Lumbar Spine Injury

Dr. Brandoff's opinion also establishes Defendant's case that Plaintiff did not sustain either a short-term or permanent lumbar spine injury. Specifically, Dr. Brandoff offered the following conclusion regarding Plaintiff's lumbar spine:

> Imaging reports reveal nothing more than mild to moderate degenerative disease. There is no evidence of traumatic injury and certainly no evidence of neurological

> deficits.   With the exception of intentionally diminished range of motion on physical examination, her lumbar examination was normal.  I see no causally-related injury or disability to the lumbar spine related to the event of November 9, 2018.  She requires no further treatment for her low back and is capable of working.

(Brandoff Report 10).  This alone satisfies Defendant's burden.  *See, e.g.*, *Spencer*, 2021 WL 5360430, at *1 ("In support of his motion for summary judgment, the defendant provides the sworn affidavits of a radiologist and an orthopedic surgeon, who assert that the defendant's impairments were either transient, the result of a preexisting degenerative condition, or the result of a prior injury. These affidavits present a prima facie case that the plaintiff did not incur a serious injury."); *Smith*, 2021 WL 3603588, at *5 (ruling that the defendant established prima facie case where the defendant's expert physician concluded that "injuries to the cervical and lumbar spine depicted in the MRIs were degenerative changes which could not have resulted from the incident of record as described" (quotation marks omitted)).

Plaintiff's attempt to undermine this report with regard to its findings in the short-term fails for the reasons described above.  In short, because Dr. Brandoff's opinion expressly discloses that his review included "an MRI of the lumbar spine dated December 21, 2018"— within 180 days of the accident—as well as Plaintiff's Doctors United Records, which also pertains to treatment within the 180-day timeframe, (Brandoff Report 6), Plaintiff's contention that it should be "discarded" and that it cannot support Defendant's attempt to establish a prima facie case remains inaccurate.  *See supra* II.B.2.  Thus, because Defendant has met his initial burden, it is incumbent on Plaintiff to meet hers.

To establish her case, Plaintiff relies upon the same evidence put forward with respect to her cervical spine, namely Dr. Cordiale's report.  For the same reasons stated above, this evidence yet again falls short.  First, Dr. Cordiale failed to document whether he conducted an active or passive ROM test during Plaintiff's examinations.  Therefore, Dr. Cordiale's "findings

are not particularly useful to this Court because he never clarified whether the tests he conducted

to elicit these results were passive or active [ROM] tests," *Hodder*, 328 F. Supp. 2d at 357, thus

"it remains unclear to what extent [the] results reflect objective medical findings rather than

[P]laintiff's subjective complaints," *Ruffin*, 2013 WL 4834368, at \*12.   Second, Dr. Cordiale's

repeated, identical notes that Plaintiff's spinal injury "does not interfere with the patient's daily

normal function," (Cordiale Report 10, 12, 13, 14, 16, 18), substantially undermines Plaintiff's

arguments that she suffered a short-term serious injury and "was 'curtailed from performing

[her] usual activities to a great extent rather than some slight curtailment.'"   *Gaddy*, 591 N.E.2d

at 958 (quoting *Licari*, 441 N.E.2d at 1091).   Third, Dr. Cordiale "failed to address, let alone

rebut, [D]efendant's [medical expert's nonconclusory finding that [P]laintiff's [injuries] were

caused by a preexisting degenerative condition." *Nickolson*, 877 N.Y.S.2d at 67.   Dr. Brandoff

specifically stated that imaging reports of Plaintiff's lumbar spine "reveal nothing more than

mild to moderate degenerative disease."  (Brandoff Report 10.)  Moreover, Dr. Brandoff found

that "[t]here is no evidence of traumatic injury and *certainly* no evidence of traumatic injury."

(*Id.*)  Having laid out that Plaintiff's injuries and pain pertains to such a degenerative disease

rather than the trauma sustained as a result of the accident, Plaintiff was required to refute this

conclusion. *Pommells*, 830 N.E.2d at 287.  However, Dr. Cordiale's report "do[es] not rebut" it

in any way. *Rhone*, 2007 WL 3340836, at \*8.  He instead offered only a "conclusory expert

opinion as to causation," *Watson-Tobah*, 2014 WL 6865713, at \*13, stating that Plaintiff's

injuries "are traumatic in origin and causally related to the motor vehicle accident" based on his

review of relevant images, tests, and examinations, (Cordiale Report ¶ 26).  This does not

"refute, or even to address, the opinion of [D]efendant's expert that the [injury] resulted from a

preexisting degenerative condition." *Agard*, 805 N.Y.S.2d at 349.  Having failed to put forth any

31

nonconclusory evidence that refutes Dr. Brandoff's opinion, Plaintiff cannot establish a prima facie case of a serious lumbar spine injury caused by the accident.

Additionally, as stated above, Plaintiff's return to work militates against establishing a prima facie case of having sustained a serious injury in the short-term; the few cases Plaintiff cites that buck this trend are at best inconsistent and unpersuasive, and otherwise simply rare exceptions to an otherwise well-established rule.  *See, e.g.*, *Martin*, 948 N.Y.S.2d at 24; *Murphy*, 744 N.Y.S.2d at 256–57.  Thus, Plaintiff has not established a prima facie case of a serious injury.  Therefore, the Court grants Defendant's Motion with respect to her lumbar spine.

### 4.  Plaintiff's Right Knee Injury

Finally, Dr. Brandoff's expert report also establishes that Plaintiff did not sustain a "serious injury" in her right knee.  In particular, Dr. Brandoff concluded that an MRI of Plaintiff's right knee "reveals nothing more than degenerative changes of the cartilage and plica," which "are atraumatic findings."  (Brandoff Report 10.)  Furthermore, his examination led him to conclude that "the right knee was normal revealing no pain, no instability, and no evidence of traumatic injury.  The right knee has no disability, and from the perspective of her right knee, [Plaintiff] requires no further treatment and is capable of working."  (*Id.*)  The report therefore establishes Defendant's prima facie case.  *See Black v. United States*, No. 17-CV-1054, 2020 WL 1435092, at *5 (W.D.N.Y. Mar. 24, 2020) ("[The] [d]efendant has made a prima facie case of non-seriousness based on the testimony of their expert . . . .  Upon reviewing [the] [p]laintiff's medical records, [the defense expert] concluded that [the] [p]laintiff had no present injury, impairment, or disability as a result of the accident." (citation omitted)); *Bass*, 2019 WL 6527944, at *5 (holding that the defendant established prima facie case via an expert physician's sworn report that an injury was properly attributed to causes unrelated to the accident).

32

Plaintiff's lack of medical records immediately following her injury undermines her ability to establish a prima facie case that she sustained a serious knee injury in the short term. Dr. Liebowitz did not evaluate Plaintiff until approximately eight months after the accident, and because Dr. Cordiale did not substantively evaluate Plaintiff's knee, the only plausible "objective evidence of a medically determined injury or impairment of a non-permanent nature" Plaintiff puts forward regarding her knee injury is that of Doctors United. *Crewe v. Pisanova*, 3 N.Y.S.3d 798, 800 (App. Div. 2015) (quotation marks omitted).

For reasons cited supra regarding the insufficient clarity and detail of such records, Plaintiff cannot rely on the ROM evaluations from Doctors United as evidence to establish her knee injury as a serious short-term injury. Again, where "a decreased ROM is asserted as proof of a serious injury, the medical findings must indicate the methodology used to calculate the reduced ROM, as well as whether such methodology consisted of active or passive ROM tests." *Catania*, 2017 WL 6317158, at *16 (citing *Watson-Tobah*, 2014 WL 6865713, at *18). Plaintiff's medical practitioners at Doctors United failed to do so, having omitted both the types of test used as well as the tools by which the practitioners measured these ranges of motion. *See Hodder*, 328 F. Supp. 2d at 357 (noting that a medical expert's "findings are not particularly useful to this Court because he never clarified whether the tests he conducted to elicit these results were passive or active range of motion tests"); *Ruffin*, 2013 WL 4834368, at *12 (discounting ROM evaluations that failed to denote if the test was active or passive because "it remains unclear to what extent her results reflect objective medical findings rather than [the] plaintiff's subjective complaints"); *Mitchell*, 708 N.Y.S.2d at 438 (affirming trial court's grant of judgment in favor of defendant where plaintiff's chiropractor "testified to the degree of limitation in range of motion of the plaintiff's neck, [but] he did not testify to the objective tests

used to arrive at his conclusions"). In light of these records' infirmities, Plaintiff cannot rely on them to establish that she sustained a short-term knee injury.

Beyond the ROM evaluations themselves, the Doctors United records more broadly cannot establish Plaintiff's short-term injury because of their insufficient causation analysis. "Courts applying New York law repeatedly have entered summary judgment in favor of defendants in personal injury actions where there was a lack of nonconclusory medical testimony establishing proximate causation." *Watson-Tobah*, 2014 WL 6865713, at *14. A review of the Doctors United records show that Plaintiff's medical practitioners at this facility simply repeated Plaintiff's claim that the cause of her injury was the accident; they made no effort to substantiate this claim or rule out other degenerative or atraumatic causes. (*See generally* Doctors United Records (failing to articulate why the accident is the lone possible cause).) Though attending physical therapy after an injury has been deemed indicative of a serious injury, Plaintiff has pointed to no authority for the notion that attending physical therapy alone is sufficient to establish a serious injury for purposes of defeating a defendant's motion for summary judgment, nor is the Court aware of any. *Cf. Yong Qin*, 625 F.3d at 778 (holding that the plaintiff raised a triable issue of fact regarding a serious injury in reliance on both adequately detailed sworn medical testimony as well as attendance at physical therapy); *Parker v. Defontaine-Stratton*, 647 N.Y.S.2d 189, 190 (App. Div. 1996) (same). Given the countervailing factors, namely Plaintiff's inability to establish causation and a lack of additional objective medical evidence immediately after her injury, this Court cannot break new ground here and must conclude that Plaintiff has failed to establish a prima facie case of a short-term injury.

Plaintiff's medical records from Dr. Liebowitz and Doctors United similarly cannot withstand scrutiny regarding any permanent knee injury Plaintiff may have suffered. The New

York Court of Appeals has made clear that "a contemporaneous doctor's report is important to proof of causation[,] [as] an examination by a doctor years later cannot reliably connect the symptoms with the accident." *Perl v. Meher*, 960 N.E.2d 424, 428 (N.Y. 2011) (emphasis omitted). Put another way, "[t]he absence of a contemporaneous medical report invites speculation as to causation." *Griffiths v. Munoz*, 950 N.Y.S.2d 787, 790 (App. Div. 2012). "Given that Dr. [Liebowitz] did not examine plaintiff until [more than] six months after the accident and that there is no other corroborative evidence indicating a causal connection between the accident and the restrictions in plaintiff's range of motion, [the Court] find[s] that Dr. [Liebowitz's] report 'impermissibly invites speculation as to causation' of [P]laintiff's restricted range of motion." *Ruffin*, 2013 WL 4834368, at *12 (quoting *Griffiths*, 950 N.Y.S.2d at 790); *see also Griffiths*, 950 N.Y.S.2d at 790 (citing a ten-month delay in seeking medical treatment for an injury as inhibiting the plaintiff's ability to establish causation between the incident and injury); *cf. Peralta v. Quintero*, No. 12-CV-3864, 2015 WL 362917, at *8 (S.D.N.Y. Jan. 26, 2015) (citing a six-week gap between an accident and an MRI as "constitut[ing] reasonably contemporaneous objective evidence"). This point is even more persuasive considering Plaintiff's efforts to seek medical care for her cervical and lumbar spine on a much shorter time horizon.

Separate from the issue of delayed treatment, Dr. Liebowitz's records suffer from the same causation issues as those from Dr. Cordiale insofar as they fail to rebut Dr. Brandoff's conclusion that her knee "reveals nothing more than degenerative changes," or "atraumatic findings," (Brandoff Report 10). There were no conclusions rebutting Dr. Brandoff's findings sufficient to support Plaintiff's contention that the accident caused her injury, which undermine her ability to establish a prima facie case. *See Pommells*, 830 N.E.2d at 283 ("Plaintiff's

submission left wholly unanswered the question whether the claimed symptoms diagnosed by [the defendant's expert] were caused by the accident."); *Spanos*, 879 N.Y.S.2d at 879 (holding that the "plaintiffs failed to raise a triable issue of fact whether [the] plaintiff's alleged pain and injuries were causally related to the subject accident rather than those preexisting conditions [identified by the defendant's expert]"); *Nickolson*, 877 N.Y.S.2d at 67 (granting summary judgment to the defendant because the "[p]laintiff's expert radiologist failed to address, let alone rebut, defendant's radiologist's nonconclusory finding that plaintiff's disc bulges and herniations were caused by a preexisting degenerative condition, or even relate the disc bulges or herniations to the accident"); *Carter*, 815 N.Y.S.2d at 43 ("In order to recover damages for noneconomic loss related to a personal injury allegedly sustained in a motor vehicle accident, a plaintiff is required to present competent, nonconclusory expert evidence sufficient to support a finding . . . that the injury was proximately caused by the accident at issue."); *Agard*, 805 N.Y.S.2d at 349 (granting summary judgment to the defendant when the defendant established that plaintiff did not suffer a serious injury via physician's expert report that "there was no evidence of any traumatic injury the accident might have caused," while the plaintiff's expert opinion "failed to refute, or even to address, the opinion of defendant's expert that the [injury] resulted from a preexisting degenerative condition."

Considering the delay between the accident and Plaintiff's efforts to get her knee examined, Dr. Liebowitz's failure to rebut Defendant's expert's opinion regarding causation, and the shortcomings of Plaintiff's Doctors United records, Plaintiff has not sufficiently rebutted Defendant's case that Plaintiff failed to sustain a permanent serious knee injury.  The Court therefore grants Defendant's Motion with respect to Plaintiff's knee.

### III.  Conclusion

For the foregoing reasons, the Court grants Defendant's Motion for Summary Judgment.

The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 34), enter

judgment for Defendant, and close this case.

SO ORDERED.

DATED:   January 13, 2022
         White Plains, New York

_____
KENNETH M. KARAS
United States District Judge